UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| FLAVIO BLADAMIR CHOGLLO CHAFLA,<br><br>      Petitioner,<br><br>v.<br><br>RODNEY S. SCOTT,<br>*Commissioner of Customs and Border Protection*, et al.,<br><br>      Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:25-cv-00437-SDN |

| | | |
|---|---|---|
| LUIS GERMAN LEMA TAMAY,<br><br>      Petitioner,<br><br>V.<br><br>RODNEY S. SCOTT,<br>*Commissioner of Customs and Border Protection*, et al.,<br><br>      Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:25-cv-00438-SDN |

| | | |
|---|---|---|
| VICTOR MANUEL TENESACA LEMA,<br><br>      Petitioner,<br><br>v.<br><br>RODNEY S. SCOTT,<br>*Commissioner of Customs and Border Protection*, et al.,<br><br>      Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:25-cv-00439-SDN |

## <u>ORDER ON PETITIONS FOR WRITS OF HABEAS CORPUS</u>

On September 2 and 3, 2025, Petitioners Flavio Bladamir Chogllo Chafla, Luis German Lema Tamay, and Victor Manuel Tenesaca Lema (collectively, the "Petitioners") filed verified petitions for writs of habeas corpus with this Court. Dkt. No. 25-cv-00437, ECF No. 7 ("Chogllo Chafla Pet."); Dkt. No. 25-cv-00438, ECF No. 9 ("Lema Tamay Pet."); Dkt. No. 25-cv-00439, ECF No. 9 ("Tenesaca Lema Pet."). On September 2, 2025, the Court ordered the Government to show cause regarding the basis of the Petitioners' detentions. Dkt. No. 25-cv-00437, ECF No. 8; Dkt. No. 25-cv-00438, ECF No. 6; Dkt. No. 25-cv-00439, ECF No. 5. The Government filed its responses to the show cause orders on September 12, 2025. Dkt. No. 25-cv-00437, ECF No. 17; Dkt. No. 25-cv-00438, ECF No. 15; Dkt. No. 25-cv-00439, ECF No. 14 (collectively, the "Gov't Resp."). The Petitioners responded on September 16, 2025. Dkt. No. 25-cv-00437, ECF No. 18; Dkt. No. 25-cv-00438, ECF No. 16; Dkt. No. 25-cv-00439, ECF No. 15 (collectively, the "Pets.' Reply"). The Court held a hearing on Petitioners' motions on September 18, 2025. I ordered supplemental briefing from both parties on Petitioners' entitlements to immediate release pending a future bond hearing, which the parties submitted on September 19, 2025. Dkt. No. 25-cv-00437, ECF Nos. 24, 25; Dkt. No. 25-cv-00438, ECF Nos. 22, 23; Dkt. No. 25-cv-00439, ECF Nos. 19, 20 (the "Supp. Brs.").[1]

Because the Petitioners' and the Government's arguments are functionally identical for all three petitions and the parties themselves address them together, I will do the same.

---

[1] The Government's responses to the show cause orders and its supplemental briefing are identical in all three cases. The Petitioners' reply briefs and supplemental briefs are identical in all three cases, but the exhibits attached in each case are specific to the individual petitioners.

## I.    Background[2]

### A. Facts

On August 23, 2025, the Maine State Police initiated a traffic stop near Bowdoinham, Maine. Gov't Resp. Ex. 1 at ¶ 5. The police officer who conducted the stop discovered that some of the occupants of the vehicle were unable to communicate effectively in English and could not "provide any identification documents." *Id*. The officer contacted U.S. Border Patrol ("USBP"), and Border Patrol Agent-Resident Agent Derek Wilcox was dispatched to the scene. *Id*. at ¶ 1. Mr. Wilcox, who speaks Spanish, spoke to the occupants of the vehicle and asked for their citizenship and immigration status. *Id*. at ¶ 7. Petitioners, all three of whom were passengers in the vehicle, each told Mr. Wilcox that they were citizens of Ecuador and did not have any immigration documents allowing them to be legally present in the United States. *Id*. Mr. Lema Tamay provided a government-issued ID to establish his identity, but Mr. Wilcox was "unable to definitively identify three of the four passengers of the vehicle." *Id*. at ¶ 10. Mr. Wilcox was concerned that the men would "abscond," so he placed all three Petitioners under arrest and transported them to the Area Port of Portland, where they were taken into USBP custody. *Id*.

On August 28, 2025, USBP contacted Immigration and Customs Enforcement– Enforcement and Removal Operations ("ICE ERO") to determine whether any ICE ERO facilities had bedspace to hold the Petitioners during the pendency of their detention. Gov't Resp. Ex. 2 at ¶ 7. ICE ERO determined that there was no space available in Maine or Massachusetts, *id*. at ¶ 8, but that it anticipated bedspace opening at ICE ERO's Port

---

[2] I draw these facts from the Petitioners' verified petitions and the parties' filings.

Isabel Detention Facility in Los Fresnos, Texas, *id*. at ¶ 9. USBP scheduled Petitioners to leave on a flight to Texas that was set to depart the morning of September 3, 2025. *Id*. at ¶ 10.

On September 2, 2025, the Petitioners filed unverified petitions for writs of habeas corpus with this Court. Dkt. No. 25-cv-00437, ECF No. 1; Dkt. No. 25-cv-00438, ECF No. 1; Dkt. No. 25-cv-00439, ECF No. 1.[3] All three petitions sought temporary restraining orders from the Court prohibiting the Government from transferring the Petitioners outside the District of Maine. Dkt. No. 25-cv-00437, ECF No. 1 at 5; Dkt. No. 25-cv-00438, ECF No. 1 at 5; Dkt. No. 25-cv-00439, ECF No. 1 at 5. The Court enjoined the Government from removing the Petitioners from Maine pending further order from the Court and set $100 bond in each case. Dkt. No. 25-cv-00437, ECF No. 10; Dkt. No. 25-cv-00438, ECF No. 5; Dkt. No. 25-cv-00439, ECF No. 5. Upon notification of the Court's orders, ICE ERO did not place the Petitioners on the scheduled flight to Texas. Gov't Resp. Ex. 2 at ¶ 10. On September 5, 2025, this Court granted the Government permission to transfer the Petitioners to the custody of ICE ERO in Massachusetts, where they are currently detained. Dkt. No. 25-cv-00437, ECF No. 16; Dkt. No. 25-cv-00438, ECF No. 13; Dkt. No. 25-cv-00439, ECF No. 12.

All three Petitioners filed motions for bond with the Chelmsford Immigration Court in Massachusetts. *See* Pets.' Reply at 3. Mr. Chogllo Chafla and Mr. Lema Tamay received notification from the Immigration Court that their bond hearing requests were denied because they are subject to mandatory detention under the Board of Immigration Appeals' ("BIA") interpretation of 8 U.S.C. § 1225. Dkt. No. 25-cv-00437, ECF No. 21; Dkt.

---

[3] Mr. Chogllo Chafla filed a verified petition later in the day on September 2, 2025. Dkt. No. 25-cv-00437, ECF No. 7. Mr. Lema Tamay and Mr. Tenesaca Lema filed verified petitions on September 3, 2025. Dkt. No. 25-cv-00438, ECF No. 9; Dkt. No. 25-cv-00439, ECF No. 9.

No. 25-cv-00438, ECF No. 19. Mr. Tenesaca Lema's bond re-determination hearing is scheduled for September 24, 2025. Dkt. No. 25-cv-00439, ECF No. 15-2 at 1.

## B. The Petitioners

Mr. Lema Tamay is a young man of Indigenous descent from Chunchi, Ecuador. Dkt. No. 25-cv-00438, ECF No. 16-1 at 6. He originally entered the country undetected in April 2019. *Id*. Since his arrival, he has been gainfully employed as a roofer in the Portland, Maine, area, and has one son—who is a U.S. citizen—with his long-term partner. *Id*. In letters of support provided alongside his petition, Mr. Lema Tamay's friends and colleagues spoke highly of his professionalism and integrity and reiterated that he is an upstanding and productive member of the local community. *See id*. at 21–30. In 2024, he was cited for driving without a license; the charge was later dismissed. *Id*. at 39. He has no other criminal record. *Id*. On his I-589 Application for Asylum form filed with the Immigration Court, he stated that he fears he would be tortured and killed if he returned to Ecuador because of organized crime and violence targeted against Indigenous Ecuadorians. *Id*. at 37.

Mr. Tenesaca Lema is also of Indigenous descent and from Chunchi, Ecuador. Dkt. No. 25-cv-00439, ECF No. 15-1 at 5. As with Mr. Lema Tamay, Mr. Tenesaca Lema's friends and coworkers spoke highly of his responsibility, integrity, and work ethic. *Id*. at 17–31. He has lived in Portland, Maine, and worked in the roofing industry since his uninspected arrival in the United States in March 2021. Tenesaca Lema Pet. at 1. He has one daughter, born in 2022, who is a U.S. citizen. *Id*. On June 17, 2021, the Department of Homeland Security ("DHS") commenced removal proceedings against him. *Id*. The case was administratively closed on February 21, 2024, due to his failure to attend a

hearing.[4] Gov't Resp. Ex. 5 at 1. Since his detention on August 23, 2025, his removal proceedings have been reopened and he is scheduled for a custody re-determination hearing on September 24, 2025. Dkt. No. 25-cv-00439, ECF No. 15-2 at 1.

In his I-589 form, Mr. Tenesaca Lema explained that he had to leave Ecuador because he had been falsely accused, threatened, and persecuted within the Indigenous justice system, and that "Indigenous communities use violence and torture against those accused of violating community rules." *Id.* at 37. He also expressed fear that he would be targeted by criminal groups for his Indigenous status. *Id.* In 2021, he was arrested for a driving offense in Maine, but the charge was later dismissed. *Id.* at 40. He has no other criminal history. *Id.*

Mr. Chogllo Chafla entered the country without inspection in February 2019. Pets.' Reply at 3. He also is of Indigenous descent and from Chunchi, Ecuador. Dkt. No. 25-cv-00437, ECF No. 18-2 at 5. He suffers from epilepsy and takes prescription medication to treat his condition. *Id.* He established a company in partnership with Mr. Lema Tamay, has lived and worked continuously in the Portland, Maine, community since his arrival, and has filed federal and state taxes for several years. *Id.* at 22, 26. As with the other two Petitioners, his friends and neighbors spoke highly of his moral character and personality. *See id.* at 16–25. In his I-589 form, he described how he had been attacked by a criminal gang in Ecuador who threatened to kill him if he did not join their organization. *Id.* at 64. He fears further torture, attacks, and potentially death if he were to return to Ecuador because of his Indigenous race. *Id.* He has no criminal history. *Id.* at 67.

---

[4] Mr. Tenesaca Lema says that his case was administratively closed because he did not receive sufficient notice of the date and time of his master calendar hearing. *See* Gov't Resp. Ex. 5 at 1; Pets.' Supp. Br. at 9; *Matter of Laparra-Deleon*, 28 I. & N. Dec. 425, 430 (B.I.A. 2022) (discussing what constitutes sufficient notice).

## II.    Discussion

### A. Procedural Posture

Petitioners filed verified petitions for writs of habeas corpus pursuant to 28 U.S.C. § 2241. In their petitions, they challenged their detentions as unlawful, and specifically contended that they would be subjected to "expedited removal" under 8 U.S.C. § 1225(b)(1) in violation of their Fifth Amendment right to due process. Chogllo Chafla Pet. at 4–5; Lema Tamay Pet. at 4–5; Tenesaca Lema Pet. at 5–6. Because all three Petitioners assert that they have been in the country continuously for more than two years, Chogllo Chafla Pet. at 1; Lema Tamay Pet. at 1; Tenesaca Lema Pet. at 1, they argued that the expedited removal statute does not apply to them and that they are entitled to hearings before the Immigration Court regarding any removal decisions, *see* 8 U.S.C. § 1225(b)(1)(iii)(II) (permitting expedited removal of noncitizens who, inter alia, "ha[ve] *not* affirmatively shown, to the satisfaction of an immigration officer, that the [noncitizens have] been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility" (emphasis added)).[5] This Court found that they met the criteria for a temporary restraining order preventing their removal, on the ground that expedited removal would likely violate their rights to due process. Dkt. No. 25-cv-00437, ECF No. 10; Dkt. No. 25-cv-00438, ECF No. 5; Dkt. No. 25-cv-00439, ECF No. 5.

---

[5] While the immigration laws largely use the term "alien," I follow many other courts in this circuit and use the term "noncitizen," which in this context has a nearly identical meaning. *See, e.g.*, *Xirum v. Bondi*, 141 F.4th 345, 351 (1st Cir. 2025) (using noncitizen and alien interchangeably).

In its response to the show cause order, the Government stipulates that it does not intend to seek expedited removal against the Petitioners under 8 U.S.C. § 1225(b)(1).[6] Gov't Resp. at 2. Rather, the Government argues Petitioners are subject to mandatory detention under 8 U.S.C. § 1225(b)(2). Gov't Resp. at 12. It also submits that even under 1225(b) the "usual removal process" of 8 U.S.C. § 1229a applies to Petitioners' proceedings, which entitles them to evidentiary hearings in front of an Immigration Judge on the issue of removal. *See* 8 U.S.C. § 1225(b)(2) ("[T]he [noncitizen] shall be detained for a proceeding under section 1229a of this title."); 8 U.S.C. § 1229a (providing to noncitizens written notice, the ability to retain counsel, and the right to be heard before an immigration judge); Gov't Resp. at 12. In sum, the Government argues that Petitioners are appropriately held in mandatory detention under § 1225(b)(2), and their detention comports with the Fifth Amendment. *Id*. at 13.

In their reply, Petitioners maintain that they are illegally detained, and seek three alternative forms of relief from this Court: (1) immediate release, (2) the Court conducts its own bail hearing on Petitioners' right to release, or (3) "order the Respondents to conduct bond hearings for each Petitioner at which the Immigration Judge considers the Petitioner's eligibility for bond under § 1226(a), and in which the Respondents are enjoined from denying the Petitioner's bond eligibility." Pets.' Reply at 14.

## B. Jurisdiction

Although none of the parties has explicitly raised the issue, "[a] federal court is under an unflagging duty to ensure that it has jurisdiction over the subject matter of the

---

[6] Because the Government stipulates that it is not pursuing expedited removal under section 1225(b)(1), I conduct no further analysis of this subsection of the statute.

cases it proposes to adjudicate." *Am. Policyholders Ins. Co. v. Nyacol Prods., Inc.*, 989 F.2d 1256, 1258 (1st Cir. 1993).

The Immigration and Nationality Act ("INA") channels immigration claims through the administrative process and sharply limits judicial review while that process is ongoing. The relevant provision provides as follows:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9). This "zipper" clause, *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999), squeezes claims relating to removal into the administrative process, only to release them for judicial review once a final administrative order is issued. Until that happens, the statute strips federal courts of jurisdiction. 8 U.S.C. § 1252(b)(9) ("[N]o court shall have jurisdiction, by habeas corpus . . . or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.").

However, the First Circuit has acknowledged that the claims-channeling provision does not cover all claims by immigration detainees. *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 10 (1st Cir. 2007) ("With respect to section 1252(b)(9), these words cannot be read to swallow all claims that might somehow touch upon, or be traced to, the government's efforts to remove a[] [noncitizen]."). A noncitizen can bring independent claims "collateral to" the removal process—such as those that "cannot effectively be handled through the available administrative process"— in federal court. *Id.* at 11. For example, "district courts retain jurisdiction over challenges to the legality of detention in the immigration context." *Id.* Likewise, noncitizens can raise

"constitutional challenges regarding the availability of bail" in court. *Id.* (citing *Demore v. Kim*, 538 U.S. 510, 516 (2003)).

Here, Petitioners' claims squarely fall within the context of challenging the legality and constitutionality of their detentions. This is sufficient for the Court to maintain jurisdiction over this action. *See, e.g.*, *Rodrigues De Oliveira v. Joyce*, No. 2:25-CV-00291, 2025 WL 1826118, at *3 (D. Me. July 2, 2025).

### C. Statutory Background

The INA gives the Government discretion to detain some noncitizens pending a decision on whether to remove them from the country, but requires the Government to detain others. Two relevant statutory provisions control: 8 U.S.C. §§ 1225 and 1226.

8 U.S.C. § 1225 governs the detention and removal of noncitizens who have not been "admitted" under the INA. An "applicant for admission" is defined by statute as "a[] [noncitizen] present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including a[] [noncitizen] who is brought to the United States after having been interdicted in international or United States waters)." 8 U.S.C. § 1225(a)(1). Section 1225(b)(2)—which the Government invokes here—creates a mandatory detention scheme by providing that, "in the case of a[] [noncitizen] who is an applicant for admission, if the examining immigration officer determines that a[] [noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] shall be detained for a proceeding under section 1229a [full removal proceedings]." 8 U.S.C. § 1225(b)(2)(A). Other than for limited exceptions not at issue here, detention under section 1225(b)(2) is mandatory, and the noncitizen is not entitled to a bond hearing. *See Jennings v. Rodriguez*, 583 U.S. 281, 297

(2018) (plurality opinion) ("[N]either § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings.").

By contrast, 8 U.S.C. § 1226 is considered the "usual removal process" and entitles a noncitizen to a wider range of due process protections. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). Under section 1226, a noncitizen who is "arrested and detained" faces three potential outcomes during the pendency of their removal proceedings: the Attorney General "may continue to detain the arrested [noncitizen]"; the Attorney General "may release the [noncitizen] on bond of at least $1,500"; or the Attorney General "may release the [noncitizen] on conditional parole." 8 U.S.C. § 1226(a). Section 1226(a) therefore "establishes a discretionary detention framework for noncitizens." *Gomes v. Hyde*, No. 1:25-CV-11571, 2025 WL 1869299, at *1 (D. Mass. July 7, 2025). The only exception to section 1226's discretionary detention regime is that the Attorney General "shall take into custody" any noncitizen involved in certain enumerated criminal activities. 8 U.S.C. § 1226(c)(1). None of those criminal activities are at issue here. *See id*.

The Supreme Court has provided guidance on the difference between the statutes. It has explained that while "U.S. immigration law authorizes the Government to detain certain [noncitizens] *seeking admission* into the country under §§ 1225(b)(1) and (b)(2)," "[i]t also authorizes the Government to detain certain [noncitizens] *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Jennings*, 583 U.S. at 288–89 (emphasis added); *see also id*. at 288 (explaining that, "*once inside* the United States . . . a[] [noncitizen] *present in the country* may still be removed" under "Section 1226") (emphasis added)).

Critically, the implementing regulations to section 1226(a) require an immigration officer to make an individualized initial custody determination, whereby the officer may release a noncitizen if they determine "that such release would not pose a danger to property or persons, and that the [noncitizen] is likely to appear for any future proceeding." 8 C.F.R. § 236.1(c)(8) (2025). If the noncitizen disagrees with the custody determination, then section 1226(a) enables them to "request a bond hearing before an Immigration Judge, at which the government bears the burden to prove that continued detention is justified." *Gomes*, 2025 WL 1869299, at *1; *Hernandez-Lara v. Lyons*, 10 F.4th 19, 41 (1st Cir. 2021) (holding the government bears the burden at a bond hearing of proving "by clear and convincing evidence that [the noncitizen] poses a danger to the community" or "by a preponderance of the evidence that [the noncitizen] poses a flight risk"). If the government fails to meet its burden, bond must be granted. *Gomes*, 2025 WL 1869299, at *2.

### D. Applicability of 8 U.S.C. § 1226

Because section 1225(b)(2) requires mandatory detention and section 1226 does not, it is dispositive to the habeas petitions to determine which statute applies to the Petitioners. The question, then, is whether section 1225(b)(2) applies to noncitizens, such as the Petitioners, who already have entered and been residing in the interior of the United States for several years. The Government contends that it does. Gov't Resp. at 13–14. Petitioners argue to the contrary that section 1226(a) "governs their detention because they have resided in the United States for years prior to their arrests." Pets.' Reply at 2. For the reasons that follow, I conclude section 1226(a) governs.

In addition to a recent opinion of this Court by Chief Judge Walker, *Rodrigues De Oliveira*, 2025 WL 1826118, nearly all district courts that have considered this issue have,

after conducting persuasive, well-reasoned analyses of the statutory language and legislative history, rejected the Government's broad interpretation of section 1225(b)(2). *See, e.g.*, *Salcedo Aceros v. Kaiser*, No. 25-cv-06924, 2025 WL 2637503 (N.D. Cal. Sept. 12, 2025); *Jimenez v. FCI Berlin, Warden*, No. 25-cv-00326, ECF No. 16 (D.N.H. Sept. 8, 2025); *Martinez v. Hyde*, No. CV 25-11613, 2025 WL 2084238 (D. Mass. July 24, 2025); *Gomes*, 2025 WL 1869299; *Lopez Benitez v. Francis*, No. 25 CIV. 5937, 2025 WL 2371588 (S.D.N.Y. Aug. 13, 2025); *Rosado v. Figueroa*, No. CV 25-02157, 2025 WL 2337099 (D. Ariz. Aug. 11, 2025), *R&R adopted sub nom. Rocha Rosado v. Figueroa*, No. CV-25-02157, 2025 WL 2349133 (D. Ariz. Aug. 13, 2025); *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1256 (W.D. Wash. 2025); *Sampiao v. Hyde*, No. 1:25-CV-11981, 2025 WL 2607924 (D. Mass. Sept. 9, 2025); *Francisco T. v. Bondi*, No. 25-CV-03219, 2025 WL 2629839 (D. Minn. Aug. 29, 2025); *Maldonado v. Olson*, No. 25-CV-3142, 2025 WL 2374411 (D. Minn. Aug. 15, 2025); *Lopez-Campos v. Raycraft*, No. 2:25-CV-12486, 2025 WL 2496379 (E.D. Mich. Aug. 29, 2025); *Diaz Diaz v. Mattivelo*, No. 1:25-CV-12226, 2025 WL 2457610 (D. Mass. Aug. 27, 2025).

The plain language of the statutes themselves largely compels the conclusion that section 1226(a) applies to petitioners and like individuals. *See United States v. Abbas*, 100 F.4th 267, 283 (1st Cir. 2024) ("We begin, as always, with the text of the statute and read it according to its plain meaning at the time of enactment." (quotation modified)). In relevant part, section 1225 reads as follows:

> [I]n the case of a[] [noncitizen] who is an applicant for admission, if the examining immigration officer determines that a[] [noncitizen] *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A) (emphasis added).

The term "seeking admission" in the statute is written in the present tense and indicates the use of a present-tense action. *See United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes."); *Martinez*, 2025 WL 2084238, at *6 ("[T]he phrase 'seeking admission' is undefined in the statute but necessarily implies some sort of present-tense action."). In the context of an "applicant for admission," the active language implies that the noncitizen is actively engaged in the exercise of being admitted to the United States, rather than currently residing here and seeking to stay. Such an interpretation comports with other immigration regulations, which define an "[a]rriving [noncitizen]" as "an applicant for admission *coming or attempting to come into* the United States." 8 C.F.R. § 1.2 (2025) (emphasis added). This interpretation aligns also with Petitioners' Notices to Appear ("NTA"), as issued by DHS, which do not check the box to designate the Petitioners as "arriving [noncitizens]." Gov't Resp. Ex. 3 at 1, Ex. 4 at 1. Rather, the NTAs check the box describing each Petitioner as "a[] [noncitizen] present in the United States who has not been admitted or paroled." *Id*. By DHS's own paperwork, the Petitioners are not considered to be "arriving" at a border.

To read the statute pursuant to the Government's interpretation would not only contravene the plain language of the phrase "seeking admission," which is written in the present tense, but would render the phrase mere surplusage. The canon against surplusage "urges courts to give each word meaning." *Ardente v. Standard Fire Ins. Co.*, 744 F.3d 815, 819 (1st Cir. 2014). Under the Government's interpretation, all noncitizens within the United States—regardless of whether they have been lawfully "admitted"—are considered in the process of "seeking admission." Under that logic, section 1225(b)(2)(A) would read as follows: "[I]n the case of a[] [noncitizen] who is an applicant for admission,

if the examining immigration officer determines that a[] [noncitizen] ~~seeking admission~~ is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] shall be detained . . . ." *See Lopez Benitez*, 2025 WL 2371588, at *6 (conducting a surplusage analysis of section 1225(b)(2)(A)).

Similarly, the Government's construction of the statute does not align with the definition of "entry" within the INA. The INA defines "admission" and "admitted" to mean, "with respect to a[] [noncitizen], the lawful *entry* of the [noncitizen] into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A) (emphasis added). While it is true that the Petitioners were never "admitted" to the country, "it does not follow that [they] continue[] to be actively 'seeking' such lawful entry at this time." *Lopez Benitez*, 2025 WL 2371588, at *6. Rather, "one would say that they had entered unlawfully but now seek a lawful means of *remaining* there." *Id*. at *7 (emphasis added). Construing section 1225(b)(2) to apply to noncitizens already residing in the country would read the word "entry" out of the definitions of "admitted" and "admission." *See* 8 U.S.C. § 1101(a)(13)(A).

The Government's interpretation also would obviate the language of a newly-passed amendment to the INA, the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). Less than a year ago, in January 2025, Congress passed an amendment to section 1226(c) which mandates detention for a noncitizen who (i) is inadmissible because he is present in the United States without being admitted or paroled, 8 U.S.C. § 1182(a)(6)(A), obtained documents or admission through misrepresentation or fraud, *id*. § 1182(a)(6)(C), or lacks valid documentation, *id*. § 1182(a)(7); *and* (ii) "is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law

enforcement officer offense, or any crime that results in death or serious bodily injury to another person," 8 U.S.C. §§ 1226(c)(1)(E)(i)–(ii).

If section 1225(b)(2) mandated detention for all noncitizens—regardless of any alleged criminal acts—then that portion of the Laken Riley Act would be redundant. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."). It is therefore safe to presume that Congress's amendment to section 1226(c)—which created a mandatory detention structure for certain noncitizens accused of crimes who were already within the country— was necessary because the existing provisions of the INA did not subject those same noncitizens to mandatory detention. *See Francisco T.*, 2025 WL 2629839, at *3 ("[I]nterpreting section 1225(b)(2) as applying to noncitizens who have already entered the country and are not currently seeking admission into the country, as Respondents urge, would render meaningless a recent amendment to section 1226 by the Laken Riley Act (LRA).").

Ultimately, if the Government's interpretation of section 1225(b)(2) were correct, it would preclude the need for section 1226(a) to exist at all: if section 1225(b)(2) is a catch-all provision that applies to *all* noncitizens residing in the country, then there would be no need for Congress to create a procedure for discretionary detention in section 1226(a). The Government's argument erodes the foundations of the careful statutory scheme Congress has created and continues to build upon—something this Court is disinclined to do.

16

The Government points to a recently issued precedential opinion from the BIA, *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (B.I.A. 2025), for further support of its position. In that case, the BIA held that "Immigration Judges lack authority to hear bond requests or to grant bond to aliens, like the respondent, who are present in the United States without admission." *Id.* at 225. I find *Yajure Hurtado* to be unavailing for the statutory interpretation reasons I have already stated and reasons I will explain in more detail below.

The Supreme Court has stated that "courts must exercise independent judgment in determining the meaning of statutory provisions," and they "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 413 (2024). When deciding whether to give deference to an agency determination, the "weight of such a judgment [by an agency] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Salcedo Aceros*, 2025 WL 2637503, at *9 (applying *Skidmore* and *Loper Bright* to analyze the *Yajure Hurtado* decision).

The BIA's inconsistency on this issue cautions against deferring to the *Yajure Hurtado* reasoning in this case. As recently as October 17, 2023, the BIA held in three unpublished decisions that Immigration Judges had jurisdiction to review the custody status of noncitizens residing in the interior of the country. *See Martinez*, 2025 WL 2084238, at *8 (referencing three such BIA decisions). In explaining its reasoning, one of the decisions noted that "[t]he Notice to Appear issued by the Department of Homeland Security ('DHS') did not charge the respondent as an arriving [noncitizen], however, but

as a[] '[noncitizen] present without permission or parole.'" *Martinez v. Hyde et al.*, Dkt. No. 25-cv-11613 (D. Mass. July 9, 2025), ECF No. 27-5 at 2 (quotation modified). Here, too, Petitioners were charged as noncitizens "present without permission or parole." Gov't Resp. Ex. 3 at 1, Ex. 4 at 1.

The BIA's decision in *Yajure Hurtado* also is at odds with decades of DHS's own practices, which the opinion acknowledges. 29 I. & N. Dec. at 225. For many years, the Executive Branch applied section 1226 to noncitizens in the interior of the country. In 1997, the Executive Branch agencies tasked with upholding immigration laws wrote: "Despite being applicants for admission, [noncitizens] who are present without having been admitted or paroled (formerly referred to as [noncitizens] who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). And in 2022, during Supreme Court oral arguments in *Biden v. Texas*, the Solicitor General stated that "DHS's long-standing interpretation has been that 1226(a) applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended." Transcript of Oral Argument at 44:24–45:20, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954); *see Martinez*, 2025 WL 2084238, at *4 n.9 (citing the same).

Although it is a plurality opinion, Justice Alito's characterization of the immigration detention statutes in *Jennings*, particularly in conjunction with the Supreme Court's other rulings, is illustrative to this district court in understanding the Supreme Court's historical application of the statutes. The plurality opinion defined section 1226(a) as the "default rule" and stated that it "applies to [noncitizens] *already present* in the United States." *Jennings*, 583 U.S. at 303 (emphasis added). This aligns with the Supreme Court's long-standing recognition of the distinction between those people who

have resided in the country for years and those who are stopped while effecting entry at the border. In *Thuraissigiam*, the Court rejected the application of due process rights to a man who was only twenty-five yards past the border into the country. 591 U.S. at 139. "[A] [noncitizen] who tries to enter the country illegally is treated as an 'applicant for admission,' § 1225(a)(1), and a[] [noncitizen] who is detained *shortly after unlawful entry* cannot be said to have effected an entry." *Id.* at 140 (quotation modified). But "[t]he distinction between a[] [noncitizen] who has effected an entry into the United States and one who has never entered runs throughout immigration law . . . once a[] [noncitizen] enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including [noncitizens] . . . ." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The Supreme Court's analyses on these issues comport with Congress's creation of different statutory schemes in sections 1225 and 1226. *See also Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) ("[O]ur immigration laws have long made a distinction between those [noncitizens] who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely on the threshold of initial entry." (quotation modified)).

Mr. Tenesaca Lema's situation underscores the tension between the Government's argument today and the historical conception of section 1225(b). When he was originally detained in June 2021, DHS commenced removal proceedings against him, but he was released back into the community until his re-detention related to the present petition in August 2025. 8 U.S.C. § 1182(d)(5)(A) provides that a noncitizen detained under section 1225 may be paroled into the country "only on a case-by-case basis for urgent

19

humanitarian reasons or significant public benefit." There is no evidence in the record indicating that either of those two exceptions apply to Mr. Tenesaca Lema.[7] It follows that because he was not mandatorily detained subject to section 1225, he must have been conditionally released under the discretionary detention scheme of section 1226(a). Other courts faced with a similar set of facts have reached identical conclusions. *See Martinez*, 2025 WL 2084238, at *4 ("The most logical conclusion to draw from these facts is that Petitioner was not 'parole[d] into the United States' 'for urgent humanitarian reasons or significant public benefit' under section 1182(d)(5)(A) but rather . . . was released upon her own recognizance as a form of conditional parole under section 1226."); *Rosado*, 2025 WL 2337099, at *7 ("[T]he record before the Court regarding Rosado's lack of detention during her removal proceedings beginning in 2018, after inspection at the border, through April 30, 2025, can only be construed as demonstrating that Rosado was conditionally paroled into the United States."). As such, I construe Mr. Tenesaca Lema's previous treatment under section 1226(a) as weighing against the Government's broad construction of section 1225(b)(2). That the Government concedes this Court should treat Petitioner Tenesaca Lema as indistinguishable from the other Petitioners only underscores the sweeping overbreadth of its position. This position, specifically inconsistent with the Government's own practices regarding Mr. Tenesaca Lema, and also inconsistent with the historical practices of its own agencies in general, surely is not what Congress intended.

---

[7] Neither party has provided the Court with a copy of Mr. Tenesaca Lema's Order of Release.

For these reasons, I conclude section 1225(b) does not apply to the Petitioners' detention, and they may be subject to detention only as a matter of discretion pursuant to section 1226(a).

## E. Due Process

Because I find that section 1226(a)'s discretionary detention scheme applies to Petitioners, I must now address the question of whether their detention without a bond hearing violates due process. The Government maintains that even if petitioners are detained pursuant to section 1226(a), that statute allows the Attorney General the discretion to detain Petitioners pending a final decision on their removal proceedings. Gov't Resp. at 14–15. As such, according to the Government, there is no violation. But the Government's argument fails to consider the plain text of section 1226(a) and its implementing regulations, which provide for noncitizens to have bond hearings to challenge their confinement, even while removal proceedings are ongoing. *See Johnson v. Arteaga-Martinez*, 596 U.S. 573, 579–80 (2022) ("Noncitizens detained under § 1226(a) receive bond hearings after the Government initially detains them." (citing 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1)). "Bond may be denied only if the government 'either (1) prove[s] by clear and convincing evidence that [the noncitizen] poses a danger to the community or (2) prove[s] by a preponderance of the evidence that [the noncitizen] poses a flight risk.'" *Gomes*, 2025 WL 1869299, at *2 (quoting *Hernandez-Lara*, 10 F.4th at 41). Here, it is undisputed that none of the Petitioners has had a bond hearing since their detention in August 2025.

Because the question of the Petitioners' current detention turns on the "adequacy of the process in the context of a civil immigration confinement," *Chipantiza-Sisalema v. Francis*, No. 25 Civ. 5528, 2025 WL 1927931, at *2 (S.D.N.Y. July 13, 2025) (citations

omitted), I turn to the three-part balancing test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Hernandez-Lara*, 10 F.4th at 27–28 (applying *Mathews* to a noncitizen's detention under section 1226(a)). The three factors are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 28 (quoting *Mathews*, 424 U.S. at 335). "The burden of proof of showing deprivation of rights leading to unlawful detention is on the petitioner." *Espinoza v. Sabol*, 558 F.3d 83, 89 (1st Cir. 2009) (citing *Walker v. Johnston*, 312 U.S. 275, 286 (1941)).

### 1. Private Interest

The Due Process Clause prohibits the deprivation of life, liberty, or property without due process of law. U.S. Const. amend. V. "'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (per curiam) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). The Petitioners here are asserting "the most elemental of liberty interests—the interest in being free from physical detention by [the] government." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004).

Section 1226(a) allows that "a[] [noncitizen] may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States," and provides three options to the Attorney General: to release the noncitizen on bond, to release them on their own recognizance, or to keep them detained. 8 U.S.C. § 1226(a). If an immigration official makes an initial determination to detain the noncitizen, the

noncitizen is entitled to appeal the decision before an Immigration Judge. *See* 8 C.F.R. §§ 1003.19(d), (e) (2025). But enforcing detention under section 1226(a) without a meaningful opportunity to challenge the confinement is a significant erosion of a noncitizen's liberty interests. *See Hernandez-Lara*, 10 F.4th at 28 ("[T]he government's exercise of its power to detain immigrants pending removal is subject to important constitutional limitations." (quotation modified)). In order to provide them the process they are due under section 1226(a), the Government must allow Petitioners the opportunity to request bond before an Immigration Judge where the Government will carry its burden as prescribed by the First Circuit in *Hernandez-Lara*. *See Rodrigues De Oliveira*, 2025 WL 1826118, at *6 ("'[D]ue process requires the government to either (1) prove by clear and convincing evidence that [a noncitizen] poses a danger to the community or (2) prove by the preponderance of the evidence that [they] pose[] a flight risk' in order to impose detention throughout the period of removal proceedings, including appeals." (quoting *Hernandez-Lara*, 10 F.4th at 41)).

Petitioners' liberty interests are thus clearly established for purposes of the first prong of the *Mathews* balancing test.

### 2. *Risk of Erroneous Deprivation*

The second prong of the *Mathews* test not only requires the Court to consider the risk to the deprivation of the liberty interest at stake, but also "the probable value, if any, of additional or substitute procedural safeguards." *Hernandez-Lara*, 10 F.4th at 28 (quoting *Mathews*, 424 U.S. at 335). Ensuring that due process is followed serves to protect all three of the Petitioners' liberty interests.

Mr. Tenesaca Lema's deprivation is arguably more pronounced than the other two Petitioners' because of his original arrest and subsequent release in 2021. Section 1226(b)

provides that "[t]he Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b). However, the BIA held in *Matter of Sugay*, 17 I. & N. Dec. 637, 640 (B.I.A. 1981), that "where a previous bond determination has been made by an immigration judge, no change should be made by a District Director absent a change of circumstance." Courts have relied on *Sugay* to enjoin the government from re-arresting a noncitizen before a custody re-determination hearing can be held in front of an Immigration Judge. *E,g.*, *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019); *dos Santos v. Noem*, No. 1:25-CV-12052, 2025 WL 2370988, at *9 (D. Mass. Aug. 14, 2025). Mr. Tenesaca Lema's liberty interest is at risk "'[u]nless and until' the government carries its burden 'to show that a change in circumstances supported its decision to revoke' the previous custody determination at a hearing before an Immigration Judge." *Bermeo Sicha v. Bernal*, No. 25-cv-00418, 2025 WL 2494530, at *7 (D. Me. Aug. 29, 2025) (quoting *dos Santos*, 2025 WL 2370988, at *9).

The Government points to the fact that Mr. Tenesaca Lema missed his master calendar hearing in February 2024 to argue that he "has positively displayed a risk of flight" sufficient to support a finding of changed circumstances to revoke his bond. Gov't Supp. Br. at 3. Mr. Tenesaca Lema responds that his nonappearance at the hearing should not weigh against him "because his non-appearance was due, according to the Immigration Judge, to the Government's failure to provide him with proper notice of the hearing as required by 8 U.S.C. § 1229a(b)(5)(A)."[8] Pets.' Supp. Br. at 9. It is not clear

---

[8] 8 U.S.C. § 1229a(b)(5)(A) states, "Any [noncitizen] who, after written notice required under paragraph (1) or (2) of section 1229(a) of this title has been provided to the [noncitizen] or the [noncitizen's] counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the [noncitizen] is removable . . . ."

from the record whether the arresting officer knew that Mr. Tenesaca Lema had missed his calendar hearing, let alone why he missed it, when he detained him. To the contrary, all that is apparent to the Court from the record is that Mr. Tenesaca Lema was re-arrested without an apparent change of circumstances. In any event, these types of factual determinations are properly decided by an Immigration Judge after a detention hearing, and only highlight the need for a hearing with properly allocated burdens to explore the risk, or lack thereof, that a noncitizen may pose to flight or dangerousness.

In sum, I find that the Petitioners run a high risk of erroneous deprivation of their liberty.

### 3. Government Interest

I agree with the Government's assertion that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process," Gov't Resp. at 15 (quoting *Demore*, 538 U.S. at 523), and that the Government has a legitimate interest in the "prompt execution of removal orders . . . which detention may facilitate," *Hernandez-Lara*, 10 F.4th at 32. But "[c]ivil detention comports with due process only when a 'special justification' outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Rosado*, 2025 WL 2337099, at *14 (quoting *Zadvydas*, 533 U.S. at 690). The Government has not identified any specific policy—other than its across-the-board application of an inapplicable statute—which would weigh in favor of the Petitioners' continued detention without a hearing. Moreover, the public interest weighs against detention without a hearing. *See Hernandez-Lara*, 10 F.4th at 33 (noting that "unnecessary detention" of noncitizens "imposes substantial societal costs"). Simply put, the government interest in avoiding any pre-detention process in this instance is minimal.

The third prong of *Mathews* therefore weighs toward the Petitioners.

### III.    Conclusion

In sum, the *Mathews* factors weigh in favor of the Petitioners and compel a hearing on detention before an Immigration Judge where they may have the opportunity to be heard. *See Bermeo Sicha*, 2025 WL 2494530, at *7; *Rodrigues De Oliveira*, 2025 WL 1826118, at *7. The question now is whether Petitioners should be released pending that hearing. The answer to that question can be complex and fact-specific, although here it appears to be straightforward.[9]

The parties all contended at the September 18, 2025, hearing that the fact that Petitioners were arrested without a warrant was irrelevant to a determination on the merits. Presumably, the Government rests its position on its contention that all three Petitioners were detained under section 1225(b)(2), which does not require a warrant. As discussed herein, detention under section 1225(b)(2) was improper. Thus, this Court is not so convinced the warrantless nature of the arrests is irrelevant, at least not when it comes to continued detention. Issuance of a warrant is a necessary condition to justify discretionary detention under section 1226(a). Section 1226(a) plainly states: "*On a warrant issued by the Attorney General*, a[] [noncitizen] may be arrested and detained . . .." 8 U.S.C. § 1226(a) (emphasis added). As such, it follows that absent a warrant a noncitizen may *not* be arrested and detained under section 1226(a). To put it simply, Petitioners' detentions are improper because there is no evidence in the record that they were arrested pursuant to a warrant. Since the Government did not comply with the plain

---

[9] The parties have continuously treated all three Petitioners alike, including by submitting joint briefing and joint argument on all three cases, presumably because the Government's position is that all such noncitizens are detained under section 1225, which this Court has found to be improper. The Court is not necessarily convinced Mr. Tenesaca Lema is similarly situated, but he also was arrested without a warrant. In any event, on the record before the Court, all three Petitioners are indeed entitled to the same relief.

language of section 1226(a), their immediate release is justified. *See Hamdi*, 542 U.S. at 529 ("[L]iberty is the norm . . . ." (citation omitted)).

In sum, Petitioners' rights to due process have been unconstitutionally deprived by the Government's actions in this case. Petitioners have been residing continuously within the country for more than two years; therefore, section 1225(b)(2)'s mandatory detention requirement does not apply. Section 1226(a) is the proper discretionary detention scheme to apply in all three Petitioners' cases, but the Government has failed to comply with the requirements of arrest and detention under that statute by failing to secure a warrant.

Accordingly, I **GRANT** the Petitioners' habeas petitions and order that they be released from detention until they receive individual bond hearings pursuant to section 1226(a). Dkt. No. 25-cv-00437, ECF No. 7; Dkt. No. 25-cv-00438, ECF No. 9; Dkt. No. 25-cv-00439, ECF No. 9. Mr. Tenesaca Lema remains subject to any conditions of release previously imposed upon him by an Immigration Judge. The Government is enjoined from denying Petitioners a bond hearing on the basis that 8 U.S.C. § 1225(b)(2) applies to Petitioners and the Government shall provide Petitioners with a bond hearing in accordance with 8 U.S.C. § 1226(a)(2) within fourteen days of the date of this order. The Government is further **ORDERED** to file a status report for each Petitioner within five days of his bond hearing, stating whether the Petitioner has been granted bond, and, if his request for bond was denied, the reasons for that denial.

SO ORDERED.

Dated this 21st day of September, 2025.

/s/ Stacey D. Neumann
UNITED STATES DISTRICT JUDGE